Mrs. James M. KEARBY *v.* YARBROUGH BROTHERS
GIN CO. AND SOUTHERN FARM BUREAU

5-5285                                   455 S. W. 2d 912

Opinion delivered June 22, 1970
[Rehearing denied August 3, 1970.]

*Eugene Mazzanti* and *Nevada Roberts,* for appellant.

*Cockrill, Laser, McGehee, Sharp & Boswell,* for appellees.

CARLETON HARRIS, Chief Justice. This is a workmen's compensation case, and the only issue is whether there was any substantial evidence to support an award made by the commission to Mrs. James M. Kearby, appellant herein, and widow of James M. Kearby, an employee of Yarbrough Brothers Gin Company, who died from a coronary thrombosis, as a consequence of coronary artery disease, on November 17, 1968. Subsequent to

the death of Mr. Kearby, the widow filed a claim for benefits, this claim being heard by a referee on April 7, 1969. In an Opinion filed on June 24, 1969, the referee held that Kearby sustained an accidental injury within the meaning of the compensation act which arose out of, and during the course of, his employment with Yarbrough Brothers Gin Company. An award of $38.30 per week commencing on November 18, 1968, and continuing until the sum of $14,500 had been paid, was made, and this award was appealed to the full commission. The commission affirmed the order of the referee, except that the amount of $38.50 per week was reduced to $35.00 per week. Thereupon, the ruling of the commission was appealed to the Lonoke Circuit Court, and on hearing, the holding of the commission was reversed, the court finding that there was no substantial evidence to support the award. From the judgment so entered, Mrs. Kearby brings this appeal.

The proof reflects that Kearby had been employed by Yarbrough Brothers Gin Company, which together with Southern Farm Bureau Insurance Company, constitute the appellees herein, for approximately twelve years, and it was his responsibility to oversee the entire operation of the gin and to maintain the mechanical years, and it was his responsibility to oversee the entire system.

According to Mrs. Kearby, for more than three weeks before his death, Kearby, 61 years of age, would arise at 4 a.m., leave the house for work by 5:30 a.m., and would never return from work earlier than 7 p.m. This was a heavier schedule than was normally followed because the busy season for cotton ginning was in progress. The witness said that on Sunday morning, November 17, 1968, the two arose, had breakfast, and Kearby remarked that he had to go to the gin to perform a repair job. Mrs. Kearby went to church, and when she returned, her husband had arrived back at the home. After lunch, Mr. Kearby went to the living room where he watched television until about 1:30 P. M. At that time he began coughing, took a dose of couch syrup, but very shortly began coughing again

and getting short of breath. He told his wife that he had gone by to see a doctor that morning and had gotten a shot; she added that he had been taking shots for some time due to chronic bronchitis. Mrs. Kearby thought that perhaps he was having a reaction from the shot and she suggested calling the doctor; however, Kearby objected, but he continued to get worse, very short of breath, and a neighbor took them to the hospital at England, Kearby being admitted about 3 p.m. He died some forty minutes later.

Grover Cleveland Arnold, an employee at the gin, testified that Kearby was the "ginner" and had the duty and responsibility of operating the gin, and repairing breakdowns. He said that it was dusty around the gin, that there were ladders, one rather steep, that had to be climbed; that Kearby repaired the belts and pulleys at the gin, sometimes carrying these belts and pulleys when he climbed the ladders. According to the witness, the belts weighed from twenty-five to approximately fifty pounds. Arnold said he had heard Kearby complain of a shortness of breath on several occasions. The witness stated that he saw Kearby's truck parked at the gin on the morning of Sunday, November 17th, but did not know whether Kearby actually performed any work while there.

Emmett Arnold, likewise an employee of the gin company, testified to approximately the same facts. Additionally, he said that he worked twelve hours per day, and that Kearby "usually stayed around a little more". He also said that frequently no lunch break was taken, but one man would eat while another worked in his place; that Kearby always brought his lunch and the job "just kept rolling".

Dr. Thomas Owen Woods, a practicing physician in England, testified that he treated Kearby on the day that he died.

"I first saw Mr. Kearby about nine-thirty on Sunday morning, with a complaint of shortness of breath. I had never seen this patient before, and I went to the

office and got his file and found he had similar complaints previously, and I advised him he should have a more thorough evaluation, and he said he didn't have time, that he would come back, and he wanted something that he usually got for his shortness of breath, which was his main complaint, and so, I gave him Neothylline, and he left. Then, about three o'clock in the afternoon, he was brought into the emergency room having severe difficulty with breathing, cold and clammy, perspiring profusely, and had hypertension. It was my opinion that he was in cardogenic shock, and I admitted him to the hospital."

The doctor said that an electrocardiogram was taken, and that he was suspicious of a myocardial infarction, and it also appeared that he had secondary congestive heart failure. Woods had examined Kearby's reports, and one was read into evidence as follows:

"This sixty-year-old white male, who expired on November seventeen, Nineteen Sixty-eight, had had a chronic cough for several years, with a diagnosis of chronic bronchitis with pneumoconiosis, which was probably partially related to his chronic irritation related to his working environment. In June, Nineteen Sixty-eight, he was seen by the Little Rock Diagnostic Clinic, Doctor Sexton Lewis, for complete evaluation, They confirmed the diagnosis of chronic bronchitis and pneumoconiosis."

The doctor testified that this was a respiratory condition, and it was his opinion that conditions in a cotton gin would tend to aggravate the ailments with which Kearby was afflicted. He further testified that this irritation of a chronic condition could tend to place a stress on the heart. The witness stated that the purpose of the Neothylline, a bronchial dilator and a diuretic, was to improve Kearby's breathing, and to remove fluid from the lungs. He also said that in cases of congestive heart failure, fluid accumulates in the lungs. Dr. Woods also said that, based on the information in Kearby's record, the latter did have a history of a heart condi-

tion. Though observing that coronary artery disease is a process that occurs over a period of many years, and an attack is more influenced by physiological conditions rather than activities, stress could precipitate an attack. The doctor would not state a conclusion on the causal relationship between the work and the heart attack, stronger than that there could be a connection.

It is this lack of positive statements on the part of the doctor that appellees point out as supporting their contention that his testimony did not constitute substantial evidence, and appellees· mention that the referee stated that, in making the award, he was not relying upon expert medical opinion "simply because there isn't any".

We have stated on many occasions that no weight is to be attached to the findings of the referee. *Potlatch Forests, Inc.* v. *Smith,* 237 Ark. 468, 374 S. W. 2d 166. We might also add that a statement was made by the referee that he had taken into consideration personal knowledge to the following effect:

"Cotton ginning is hard work; that conditions surrounding the work are extremely dusty; that dust and lint during the ginning season are constantly in the air, covers the machinery, employees and the entire vicinity of the gin as well as the adjoining neighborhood; and, gas dryers generate a sufficient amount of heat and to the point of creating uncomfortable working conditions."

Under the facts of this case, there was no proper basis for this statement concerning personal knowledge, but it does not appear, from the order entered, that the commission paid any attention to it, that body making reference to the evidence, and then finding that there was a causal connection between the decedent's employment and his death.

This is a rather close case, and we, no doubt, would affirm if the finding had been against Mrs. Kearby. On

the other hand, the commission having decided in favor of her contentions, we do not feel that we can say that there was no substantial evidence to support the award. This court has said on more than one occasion that the strongest rule in -compensation cases, and the one carrying the greatest weight, is that if there is any substantial evidence to support the findings of the commission, we will not disturb those findings. *Reynolds Metal Co.* v. *Robbins,* 231 Ark. 158, 328 S. W. 2d 489.

Here, the evidence clearly establishes that Kearby had been working long hours for several weeks preceding his death; that working conditions were extremely difficult for one who was afflicted with chronic bronchitis with pneumoconiosis; that this chronic condition was related to his working environment; that he was suffering on the morning of November 17th prior to going to the gin, and received medical attention.

Appellees refer to the indefinite answers given by Dr. Woods, and assert that his testimony is of no aid to appellant. From reading the transcript, it appears that this physician was very conscientious, and was endeavoring to avoid making any statement that he could not completely substantiate. Though he refused to say that the heart attack was occasioned by the employment, he did say that conditions in the gin would tend to aggravate the chronic ailments with which Kearby was afflicted, and that the irritation of a chronic condition *could* tend to place a stress on the heart. He also *said* that the purpose of the medicine given Kearby on Sunday morning was to improve the latter's breathing, and to remove fluid from the lungs. As already set out, he stated that in cases of congestive heart failure, fluid accumulates in the lungs.

We have pointed out in our cases that mathematical certainty is not necessary in stating the cause of death. *United States Fidelity & Guaranty Co.* v. *Dorman,* 232 Ark. 749, 340 S. W. 2d 266. In *Atkinson v. United States Fidelity & Guaranty Co.* (Texas) 235 S. W. 2d 509, the trial court, in a workmen's compensa-

tion case, held a claim of appellant not compensable because there was no evidence of an accidental injury, and no evidence of a causal connection between the work and the death of appellant's husband. In reversing, the Court of Civil Appeals of Texas (San Antonio) said:

"It is urged that because Dr. Longoria at one point *testified that, 'it is a possibility* that the origin (of the disease) was incited through strain and stress and exposure,' this case comes within the rule that something more than a showing of mere 'possibility' is necessary to establish a finding of causal connection. [citing cases] In determining whether or not a showing of mere possibility and no more has been made, all of the pertinent evidence on the point must be considered. The fact that an expert medical witness, in speaking of cause and effect uses such expressions as 'might cause', 'could cause', 'could possibly cause', or phrases similar thereto does not preclude a jury finding of causal connection, provided there be other supplementary evidence supporting the conclusion. Causal connection is generally a matter of inference, and possibilities may often play a proper and important part in the argument which establishes the existence of such relationship."

We think the above language is pertinent to the cause at hand, and our views might well be summed up by the language used in *Hall* v. *Pittman Construction Co.* 235 Ark. 104, 357 S. W. 2d 263. There, we said:

"Under the substantial evidence rule that prevails in a case of this kind the appellant shoulders a heavy burden in seeking a reversal of the commission's decision upon an issue of fact. In order to succeed the appellant must show that the proof is so nearly undisputed that fair-minded men could not reach the conclusion arrived at by the commission. After studying the record we are unable to say that the appellant is entitled to a reversal; that is, that there is no substantial evidence to support the commission's findings."

The judgment of the Lonoke Circuit Court is reversed, and the cause is remanded with directions to reinstate the award made by the commission.

It is so ordered.

BROWN AND FOGLEMAN, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. Because of a failure of appellant to show causation by medical testimony, I would affirm the circuit court, in spite of the commission's holding. How the doctor's testimony can be said to lend substantial support to the commission's finding is beyond my comprehension. The doctor's admission that there could be a connection between the decedent's work and a heart attack was a reluctant and highly speculative one to say the least. His testimony on this point follows:

Q. I say, in your opinion, is there a relationship between the degree of stress and strain from his occupation and the occurrence of his condition?

A. Well, — —

Q. I am referring to the condition of chronic bronchitis and pneumoconiosis, as well as his subsequent fatal heart attack.

A. I think these would have to be separated. I couldn't give you one answer for both.

Q. Okay. Is there a definite relationship between a degree of stress and strain on his bronchitis and pneumoconiosis and his occupation?

A. I would think so, yes.

Q. And was there a relationship, assuming that he had a heart condition, was there a relation-

ship between what he was called on to do in his occupation as to his condition of heart disease? Was there a relationship with the stress there?

A. I don't believe I could answer that, because I don't know how much stress he had.

Q. Could you better answer it, Doctor, if you heard some of these witnesses testify as to what his activities were at the gin?

A. Possibly. Can I make a statement to sort of clarify some ____

Q. Yes, go right ahead, Doctor.

A. The coronary artery disease is a process that occurs over many years, and whether a person is working or whatever his activity, the ultimate cause of this or the gradual buildup of these plaques in the arteries are on a physiologic basis, not so much on his activity.

Q. I know that, Doctor, but couldn't a stress or trauma or sudden exertion cause one of these plaques to dislodge?

A. Could precipitate an attack, yes.

Q. So, then, Doctor, is it correct to state then, if he was engaged in the type of work that tended to create stress or exertion, that it could precipitate an attack? Is that correct?

A. I am afraid I can't answer that for sure.

Q. Well, Doctor, I am not trying to make you say, Doctor, that he went to work that morning, and this work made him have a fatal heart attack. I am saying he was doing the type of work that there could be a causal re-

lationship between this work and his heart attack. Do you agree with that?

A. You're saying there could be?

Q. Yes, there could be.

A. I *could*[1] say there *could be,*[1] yes.

Q. Now, Doctor, in your opinion, then, did Mr. Kearby's work at the gin contribute to his heart attack?

A. I am afraid I can't answer that.

Q. Doctor, now you did state that this fluid in the chest, which was an indication of bronchitis and pneumoconiosis, would place or could place stress on the heart, is that correct?

A. Yes.

*   *   *

Q. And you know that he had coronary artery disease?

A. I don't know myself, other than his record.

Q. Well, his record shows that?

A. Yes.

Q. Which is a condition not necessarily caused by any particular activity, is that right?

A. That is correct.

Q. Physiological in nature?

A. That is correct.

---

[1]Emphasis mine.

1106

Q. And referring to the death certificate, it is your opinion that he had a thrombosis of a coronary artery, one or more, is that right?

A. That's right.

Q. Producing a myocardial infarction, is that right?

A. That's true.

Q. Or what we layman call a heart attack?

A. Right.

Q. And he died?

A. Right.

Q. Do you know, beyond that, what caused his death, other than that he had coronary artery disease that resulted in a thrombosis that resulted in a heart attack.

A. I do not.

Q. You are not telling this Referee that, if indeed he had chronic bronchitis and pneumoconiosis, this caused his heart attack, are you?

A. No.

Q. You are not telling him that?

A. No.

Q. And you are not telling the Referee that, if he did any work on November Seventeen or the day before or the week before, that that caused his heart attack?

### A. No.

I agree that the referee's finding is not for consideration by the courts, and that there was no proper basis for the referee to resort to his personal knowledge. He was correct, however, in his statement that there was no expert medical opinion to rely upon. With all due respect, I suggest that the majority of the commission, consciously or unconsciously, did the same thing the referee did without saying so, i. e., make a finding without medical testimony upon which to rely. I do not think that anyone could argue that the question posed on this appeal is not addressed peculiarly to the realm of scientific knowledge or that it is the sort of determination that the Workmen's Compensation Commission could make independently upon the basis of its own medical conclusions. See *W. Shanhouse & Sons, Inc.* v. *Simms*, 224 Ark. 86, 272 S. W. 2d 68.

I was confident that this court had reached the extreme limits on uncertain medical testimony in heart cases in *Bradley County* v. *Adams*, 243 Ark. 487, 420 S. W. 2d 900. I adhere to the views I expressed there, but even if I did not, this evidence is far too conjectural to justify the commission's finding of fact in a case where the question was peculiarly within the realm of scientific knowledge.[2]

Of course, mathematical certainty is not required to show a causal connection, but reasonable medical certainty should be. Without saying so, we recognized this principle in *Georgia-Pacific Corporation* v. *Craig*, 243 Ark. 538, 420 S. W. 2d 854. There we said that the doctor's testimony was less positive than medical testimony in some cases, but pointed out that he stated his personal opinion that death resulted from the deceased's long work hours on the day of the attack from which death ensued. We once recognized that there was a difference in a "possibility" and a "probability"

---

[2] In *Bradley* it could have been more easily said that the attack was caused by "accident" or unusual exertion and that the death soon thereafter was logically attributable than in this case.

in evaluating medical testimony as to causal connection. See *Chapman* v. *C. Finkbeiner, Inc.,* 230 Ark. 655, 324 S. W. 2d 348. I submit that this is an appropriate distinction. We appear in this decision to be abandoning these appropriate distinctions.

Professor Larson, in 2 Workmen's Compensation Law 304 § 79.59 (1969), has this comment on the subject:

> * * * The increasing tendency to accept awards unsupported by medical testimony should not be allowed to obscure the basic necessity of establishing medical causation by expert testimony in all but- the simple and routine cases—and even in these cases such evidence is highly desirable and is part of any well-prepared presentation.

I regret that this court is applying a rule followed by a decided minority of jurisdictions on the authority of an intermediate appellate court. In addition to authorities cited in my dissenting opinion in *Bradley County* v. *Adams,* supra, I should like to call attention to the following:

> Award reversed where only medical testimony was that causal connection was remotely possible, because medical evidence must show probability, not mere possibility. *Stacey* v. *Carnegie-Illinois Steel Corp.,* 156 Ohio St. 205, 101 N. E. 2d 897 (1951).

> Where causal relationship between injury and alleged accident is not obvious, unequivocal medical testimony is necessary. *Lingle* v. *Lingle Coal Co.,* 203 Pa. Super. 464, 201 A. 2d 279 (1964).

> Claimant must provide expert medical testimony to establish causation as a medical probability. *Gammon* v. *Ebasco Corp.,* 74 N. M. 789, 399 P. 2d 279 (1965).

> Medical evidence that there was a possibility that

fatal coronary occlusion was caused or aggravated by work exertion, held not to support an award. *Southwestern Bell Telephone Company* v. *Gregory*, 399 P. 2d 484 (Okla. 1964).

With the uncertainty of the testimony of the witness, and his extreme reluctance to even admit a possibility of causal connection, I am unable to fathom the reasoning by which the majority finds substantial evidence to support this finding by a divided commission.

I would affirm the circuit court's judgment.

BROWN, J., joins in this dissent.