INTERNATIONAL PAPER COMPANY *v.*
CARL J. TIDWELL

5-5555                                                466 S. W. 2d 488

Opinion delivered May 10, 1971

624

*Gaughan, Laney, Barnes & Roberts,* for appellant.

*Smith, Williams, Friday & Bowen;* By: *G. Ross Smith,* for appellee.

JOHN A. FOGLEMAN, Justice. Two questions are presented on this appeal. The first is whether the Arkansas Workmen's Compensation Commission has jurisdiction of this claim—or more properly stated, whether the Arkansas Workmen's Compensation Law can be applied. The second is whether the claimant Tidwell has suffered a compensable injury. The commission held against appellant on both points. There has been no determina-

tion that appellee has suffered a permanent disability resulting from accidental injuries. This matter was reserved until the commission hears additional evidence as to the end of the healing period and as to permanent disability. The only award made is for compensation for a period from August 8, 1968, through September 22, 1968 and from October 17, 1968, until a date to be later determined and for medical expenses incurred as well as those to be incurred for additional medical treatment to be arranged by International Paper Company through Dr. Jim Moore.

The first is a mixed question of law and fact. Insofar as the factual determinations are involved, the findings of the commission are binding upon the courts if there is any substantial evidentiary support. *Voss* v. *Ward's Pulpwood Yard,* 248 Ark. 465, 452 S. W. 2d 629. We must accept that view of the facts which is most favorable to the commission's findings. *Albert Pike Hotel* v. *Tratner,* 240 Ark. 958, 403 S. W. 2d 73. Where fair-minded men might honestly differ as to the conclusion to be drawn from facts, either controverted or uncontroverted, the drawing of inferences and reaching of conclusions are for the commission, not the courts. *Guynn* v. *Helena Hospital,* 240 Ark. 56, 398 S. W. 2d 526. The commission found it had jurisdiction because appellee was a citizen and resident of Arkansas both prior to and at the time of his injuries, was paid under the supervision of appellant's Arkansas office, was paid his wages in Arkansas and the contract of employment was entered into in Arkansas. There was substantial evidence to support these findings.

Tidwell was born in Arkansas. He was employed by the United States Corps of Engineers for 10 years prior to his employment by International. He was operating a bulldozer at Lake Ouachita in this previous employment when he applied for a job at appellant's regional office in Camden, Arkansas. He took a physical examination at Camden to meet appellant's requirements. He testified that he considered Hot Springs, Arkansas, to be his home. He had no family, except for his parents who lived at Mt. Ida, Arkansas. He did not live with

.them. Tidwell reported to work at Jefferson, Texas, on Monday, June 24, 1968, as a member of a five-man crew of which one Wells was foreman. Wells' orders and directions came from the Camden office. Paychecks of all employees of International working in Texas and other parts of the Western Region are issued from Camden. When Tidwell needed medical attention after August 7, he returned home and went to Dr. Lon E. Reed at Hot Springs, under whose care he remained for four weeks. When his doctors advised him to return to work, he went back to Jefferson and worked September 23 and 24. He suffered a recurrence of his earlier symptoms, had to be relieved from driving a bulldozer, and returned home to Hot Springs. Subsequently, at the suggestion of Grady Collier, appellant's Road Maintenance Foreman for its Western Region, he drove a dump truck at Hampton, Arkansas, about two weeks, after which he felt that he was unable to continue in that work. All his medical treatment has been in Arkansas.

Tidwell testified that he left his job in Arkansas on Friday before reporting to his new employer in Texas on Monday. His work required him to move from place to place in Texas and to obtain a place to live in each. While in Texas he lived at Jefferson in a room in a private home for three or four days in June, at Carthage in a motel for about three weeks and at Center in a boarding house for about two weeks just prior to August 2. All of these are within a radius of 30 miles. Orders for these various job assignments came from the Camden headquarters. All of the members of Tidwell's crew lived in private homes, boarding houses or motels and had to find new places to live as they moved about their territory.

The Western Region of International encompasses Arkansas, the eastern half of Louisiana, east Texas and a part of Oklahoma. Its headquarters are at Camden, and Tidwell was hired by Collier there. He was employed to work in Texas and considered a regular member of his crew in one of the districts there. Each district has its on management. The road foreman for In-

ternational's entire Western Region lives in Arkansas, but his duties take him over the entire region. The International employee with whom Tidwell roomed while he worked at Hampton was a Texas resident. Tidwell was treated as a Texas employee by International. The timekeeper,. who had responsibility for payroll, insurance and compensation matters for the company had his office at Camden. Tidwell was covered by the company's workmen's compensation insurance in Texas, and his wages reported to the State of Texas for that purpose.[1] The company uniformly carried its workmen's compensation insurance on those employed to work in a particular state in that state. It contends that, since Tidwell was employed to work in Texas and suffered whatever injury he did suffer in that state, Texas law governs. Since the evidence, when given its strongest probative force in favor of the commission's findings of fact, is substantial, as we have illustrated, the question becomes one of law.

We have never directly passed upon this question. In approaching it, we have no specific statutory provision to govern us as do most other states. See I Schneider, Workmen's Compensation Text, Chapter 5; 3 Larson, Workmen's Compensation Law 375, *et seq.*, §§ 87.00, *et seq.* Workmen's compensation is governed wholly by statute, so unless we find a statutory basis for entertainment of a claim, an employee must be left either to his common law remedy or to the compensation laws of another state when the injury took place in that state. Ark. Stat. Ann. §§ 81-1323 (b) (Repl. 1960) and 81-1325 (b) (Supp. 1969) contain the only express mention of extraterritoriality in our act. In the former section, we find clear recognition that a claim may be allowed when the accident took place outside the state if compensation is payable under the act. Then the hearing may be held either in the county of the employer's residence, or of his place of business or of greatest convenience as determined by the commission. The later section only provides that appeal from the commission's action goes to the circuit court of the county in which the hearing was

---

[1] There is no evidence that Tidwell had any knowledge of this fact or that he consented to this coverage.

had when the accident occurred outside the state. It should be noted that there is no limitation in these sections on the nature of out-of-state accidents which may be heard by the commission. Consequently, we must turn to other provisions for any limitations there might be. If there is a limitation it must be found in provisions having to do with coverage. Insofar as the facts of this case are concerned: an employee is one in the service of an employer under a contract of hire, Ark. Stat. Ann. § 81-1302 (b) (Repl. 1960); an employer is one carrying on an employment, Ark. Stat. Ann. § 81-1302 (a) (Repl. 1960); and employment means every employment carried on in the state, Ark. Stat. Ann. § 81-1302 (c) (Repl. 1960). Liability for compensation is based upon disability or death from injury "arising out of and in the course of employment." Ark. Stat. Ann. § 81-1305 (Repl. 1960).

In considering these statutory provisions and definitions, we must construe and apply them liberally in favor of a claimant in the light of the beneficent and humane purposes of the act, resolving all doubtful cases in his favor. *Reynolds Metals Co.* v. *Brumley,* 226 Ark. 388, 290 S. W. 2d 211; *Arkansas Nat. Bk.* v. *Colbert,* 209 Ark. 1070, 193 S. W. 2d 806; *E. H. Noel Coal Co.* v. *Grilc,* 215 Ark. 430, 221 S. W. 2d 49; *Donaldson* v. *Calvert McBride Printing Co.,* 217 Ark. 625, 232 S. W. 2d 651; *Clemons* v. *Bearden Lumber Co.,* 236 Ark. 636; 370 S. W. 2d 47; *Clemons* v. *Bearden Lumber Co.,* 240 Ark. 571, 401 S. S. 2d 16; *Elm Springs Canning Co.* v. *Sullins,* 207 Ark. 257, 180 S. W. 2d 113; *Hunter* v. *Summerville,* 205 Ark. 463, 169 S. W. 2d 579. Liberality of construction with reference to individual rights under our act is resorted to whenever obscurity of expression or inept phraseology appears and, given a restrictive construction, would have the effect of defeating praiseworthy purposes that undoubtedly actuated our lawmaking body. *Massey* v. *Poteau Trucking Co.,* 221 Ark. 589, 254 S. W. 2d 959. See also *McGehee Hatchery Co.* v. *Gunter,* 237 Ark. 448, 373 S. W. 2d 401; *Sallee Bros.* v. *Thompson,* 208 Ark. 727, 187 S. W. 2d 956.

Recognized purposes of the act are to improve employer-employee relationships, to insure the security of

employees following covered employment by substituting awards for losses sustained by reason of such employment which are more nearly proportionate to the loss and more certain and more satisfactory than former remedies in tort, to ameliorate the condition of disabled workers by shifting a part of the burden of accidents in covered employment to the public in general and to charge to the ultimate consumers a part of the loss from risks of such employment. *Hughes* v. *Hooker Bros.,* 237 Ark. 544, 374 S. W. 2d 355; *Hunter* v. *Summerville,* supra; *Williams Mfg. Co.* v. *Walker,* 206 Ark. 392; 175 S. W. 2d 380. We have said that these purposes are based upon a contractual relationship and the public welfare. *Gentry* v. *Jett,* 235 Ark. 20, 356 S. W. 2d 736.

In considering cases involving out-of-state accidents, we have followed a policy of liberality rather than restrictiveness. In *McGehee Hatchery Co.* v. *Gunter,* 234 Ark. 113, 350 S. W. 2d 608, we held that a Mississippi resident, who was a traveling salesman for an Arkansas concern, injured in an accident in Mississippi, was entitled to pursue his claim against his Arkansas employer under Arkansas law in spite of the fact that he had been paid maximum benefits under Mississippi law for the same accident by a Mississippi employer. We also rejected a narrow and restricted construction when we said that an employment did not cease to be "carried on in this state" by reason of only temporary and incidental operations in another state, in holding that an employer was subject to the act, even though he did not have five employees, unless those working in Missouri at the time one of them was injured were counted. *Feazell* v. *Summers,* 218 Ark. 136, 234 S. W. 2d 765. We also found no sound reason that the laws of a state in which an employee was injured could keep this state from discharging its contractual obligation under the Workmen's Compensation Act to one of our citizens. *Gentry* v. *Jett,* 235 Ark. 20, 356 S. W. 2d 736.

In considering federal constitutional limits on application of state laws in compensation cases, Professor Larson points out six grounds on which the applicability of a particular compensation act has been asserted. They are:

(1)  Place where the injury occurred;
(2)  Place of making the contract;
(3)  Place where the employment relation exists or is carried out:
(4)  Place where the industry is localized;
(5)  Place where the employee resides; or
(6)  Place whose statute the parties expressly adopted by contract.

Professor Larson then expresses the opinion, which seems to be supported by authority, that the state which was the *locus* of any one of the first three items and perhaps of the next two, can constitutionally apply its statute if it wants to, in spite of "full faith and credit" attacks. 3 Larson's Workmen's Compensation Law 368, § 86.10.

Satisfaction of constitutional standards is not a sufficient basis for a state's application of its own law. The state itself must make the application, or authorize it, by statute.[2] Early decisions held that these statutes had no application to extra-state injuries without unequivocal statutory language making them applicable. See *In re Gould,* 215 Mass. 480, 102 N. E. 693 (1913). This approach is not in accord with the liberal construction view we take. Many later decisions have not followed the Massachusetts court. As early as 1915, the Connecticut Supreme Court recognized that no statute has extraterritorial effect unless the intention that it have is clearly expressed or reasonably to be inferred from the language of the act, but held that in determining whether such an inference was reasonable, its workmen's compensation act was to be given a liberal construction to effectuate its remedial purpose and to be read in the light of its purpose, subject matter and history. That court found that a limitation of the act to compensation for intrastate injuries would tend to defeat the ends in view. On the other hand it found a

---

[2]An excellent discussion of the problems involved, and approaches taken and factors considered in solving them will be found in American Conflicts Law by Dr. Leflar, §§ 158, 159, 160 and 161.

reasonable inference that the legislature deemed the place of injury unimportant when it bottomed the right to compensation upon contract. In interpreting its act, that court found significance in the place of domicile of the injured party, the place of contract between the employer and employee and the location of the employer. The Connecticut act was not as extensive on the subject as ours, as it apparently limited filing of awards to the county in which the injury occurred and appeals to the superior court for the county in which the injury was sustained. *Kennerson* v. *Thames Towboat Co.*, 89 Conn. 367, 94 A. 372 (1915).

Most of the jurisdictions lacking specific and unequivocal statutory language have followed similar approaches. In *Grinnell* v. *Wilkinson*, 39 R. I. 447, 98 A. 103 (1916), the court followed the Connecticut decision, saying that its own act should be read into every contract of employment between those subject to its terms. In reaching its decision the Rhode Island court mentioned the likelihood that one of its residents injured elsewhere would come home for treatment and prosecution of his remedy and would be subject to examination in Rhode Island.

In giving a liberal construction to the Iowa act, some emphasis was placed by the court upon a statutory provision like ours for compensation for any and all injuries sustained, without any limitation other than that they shall occur in the course of and arise out of the employment. *Pierce* v. *Bekins Van & Storage Company*, 185 Iowa 1346, 172 N. W. 191 (1919). [See Ark. Stat. Ann. § 81-1302 (d) (Repl. 1960)]. Later the rule that out-of-state injuries were covered by the Iowa compensation act was extended to an employment carried on by the employee, an Iowa resident, wholly within the state of Oklahoma, as contemplated by the parties when the contract of employment was entered into in Iowa. *Haverly* v. *Union Const. Co.*, 236 Iowa 278, 18 N. W. 2d 629 (1945). In that case, the Iowa office of the employer reimbursed the local office in Oklahoma for payroll disbursements approved in Iowa, general manage-

ment and control was maintained in the Iowa office, and all bills were paid and books kept in the Iowa office.

In New Jersey, it was held that a contract of employment entered into in New Jersey with an employer maintaining a New Jersey office calling for services to be performed by a New Jersey resident exclusively in Pennsylvania, containing a provision that it be interpreted according to the laws of Pennsylvania, did not prevent New Jersey compensation law from entering into the contract by operation of law, regardless of the place where the compensable injury occurred. *Gotkin* v. *Weinberg,* 2 N. J. 305, 66 A. 2d 438 (1949).

It was also held that the Wisconsin commission had jurisdiction to make a compensation award to a Wisconsin resident who accepted an offer of employment by a Wisconsin corporation and immediately went to Michigan in furtherance of his employment, where he was injured. The court held that upon these facts, the status of employee and employer was covered under the Wisconsin act, even though no work was performed by the employee within Wisconsin. *Julton-Kelly* v. *Industrial Commission of Wisconsin,* 220 Wis. 127, 264 N. W. 630 (1936). See also *Dunville* v. *Industrial Commission,* 228 Wis. 86, 279 N. W. 695 (1938).

In New York, the rule seems to be that the New York laws are applied in cases of extrastate injuries to employees whose services are performed in another state if there are sufficient significant New York contacts, whenever the employment is not carried on at a fixed location. See *Cameron* v. *Ellis Const. Co.,* 252 N. Y. 394, 169 N. E. 622 (1930); *Nashko* v. *Standard Water Proofing Company,* 4 N. Y. 2d 199, 149 N. E. 2d 859 (1958); *Rutledge* v. *Kelly & Miller Bros. Circus,* 18 N. Y. 2d 464, 223 N. E. 2d 334 :1966); *Shorr* v. *U-Wan-Na-Wash Frocks,* 284 App. Div. 778, 135 N. Y. S. 2d 143 (1954); *Baduski* v. *S. Gumpert & Co., Inc.,* 277 App. Div. 591, 102 N. Y. S. 2d 297 (1951); *Burton* v. *Ziegler Pharma-*

*cal Corp.,* 9 App. Div. 2d 811, 192 N. Y. S. 2d 509 (1959); *Levin* v. *Eutectic Welding Alloys Corp.,* 21 App. Div. 2d 925, 251 N. Y. S. 2d 127 (1964).

It is true that the acts in some of the above states are elective and that the employee in some cases from others either had previously performed employment for his employer in the state where the claim was asserted or did regularly perform a part of his duties in that state. None of them had more specific statutory prescription of extraterritorial application than we have. When we consider the interest that this state has in the welfare of its residents, in minimizing the likelihood of their becoming public charges or objects of local charity, in having a procedure for a remedy readily available to its residents, and in securing compensation to physicians and hospitals in Arkansas which might not otherwise be available to a claimant, we cannot say that reason and logic require a different approach to a liberal construction of our statute because of these limited dissimilarities, in spite of the fact that a different result has been reached in other jurisdictions, and the fact that the injury might be compensable under the laws of another state.

We have no hesitation in holding that where the contract of employment is entered into in this state between an Arkansas resident and an employer who is localized as a resident or who maintains an office which exercises general superintendence and control over the employment which is not carried on at a fixed location, the Arkansas Workmen's Compensation Act applies and the Arkansas Workmen's Compensation Commission has jurisdiction, even though the injury occurred in a state in which it was contemplated by the parties that the employment would be entirely performed. This result is consistent with our previous decisions earlier cited. It is also harmonious with Restatement of the Law, Conflict of Laws § 398.

The second point for reversal presents a close question. Appellant argues that appellee's disabilities are attributable entirely to vascular disease and that his

employment did not contribute in any way to his condition. Appellee contends that exertions required of him in the performance of the duties of his employment aggravated his condition and accelerated his disability, so as to provide the necessary causal connection. Appellant says, however, that whatever exertion was required of Tidwell only excited symptoms of his vascular disease but did not aggravate his condition or cause any damage to Tidwell's system that was disabling. While the question is not free from doubt, and we might well have sustained a contrary finding by the commission, we cannot say that the evidence in support of the commission's award, when all doubts are resolved in favor of the claimant, was not substantial.

Inasmuch as the question here is one peculiarly within the realm of scientific knowledge, we must find support in the medical testimony in order to say that the evidence of causal connection is substantial. We will review the evidence forming the background for medical testimony only to the extent necessary to connect Tidwell's condition with his medical examinations and treatments. The commission related Tidwell's disability to an occasion on August 5 when he crawled under a truck, furnished him by his employer for performance of his duties, to grease it, and to another occasion on August 7 when he assisted in putting a misaligned bulldozer track on its proper supports. It found that the claimant had some disabling residual paralysis from a pre-existing carotid vascular disease characterized by a syndrome of atheromatous plaques in the carotid artery, contributed to and aggravated by claimant's work. Specific reference was made by the commission to the opinion of Dr. Jim Moore, a Little Rock neurosurgeon, that the immediate cause of the claimant's blurring of vision and numbness in his left arm and leg was related to a decreased oxygen supply to appellee's brain due to a marginal right carotid artery at a time when the brain demanded increased oxygenation because of increased body heat and exertion.

Tidwell satisfied his employer's health requirements. He apparently worked without any difficulty

until August 5 as a heavy equipment operator in a road construction crew, although he had not been feeling well for the last two weeks of the period. On August 5 he was driving a truck servicing tractors with water, fuel, oil and grease. He crawled under a bulldozer to lubricate some part and began to feel ill and to experience aching and numbness in his arms and legs and a blurring of his vision. He crawled out, lay down and rested for about an hour. Having no drinking water, he drove his truck to a place where other employees were working, drank some water, ate a part of a sandwich and helped load a water pump. His foreman cautioned him that he might be taking the "flu" and to be careful. He explained to his foreman that he had gotten awfully hot, that he really was not "working all that hard" but was out of water. The temperature was in the mid-nineties. Tidwell testified that his difficulties occurred while he was working in a hot sandy area which was exposed to the sun and from which any breezes were obstructed.

On August 6 he did only very light work by the direction of his foreman, but on August 7 went with his foreman to help five or six other employees in attempting to replace a misaligned bulldozer track. It was a hot day and all of the men thus employed were suffering from heat and resting in the shade at frequent intervals. He worked from 10:30 a.m. until 5:00 p.m. Tidwell said that he was overheated by this work, and could not even get up enough strength to use a grease gun. He told his foreman he had had enough and went home where he saw his Hot Springs physician the next day.

Tidwell did not see Dr. Moore until October 17, after he had driven a dump truck at Hampton for 13 days. He quit because the work on the narrow roads made him nervous and because he was having some difficulty with his vision. Dr. Moore diagnosed his disease in both carotid arteries. He attributed the basic cause to hardening of the arteries, which produced an abnormal collection of tissues or plaques in the arteries, which tend to cause an obstruction therein. When one's arteries are thus obstructed, he will experience inter-

mittent episodes of numbness in the extremities, a tingling sensation in his hands and feet and some blurring of vision, according to Dr. Moore.

The disease is clearly not occupational. After the first episode, Dr. Reed, a general practitioner, had originally diagnosed appellee's trouble as heat exhaustion, but later sent him to a neurosurgeon who only found a chronic syndrome attributable to plaques in a carotid artery. On his first examination, Dr. Moore found evidence of a partial paralysis of the left side of Tidwell's body, which evidenced abnormality of the carotid artery. He found the extent of Tidwell's development of hardening of the arteries unusual for his age. He stated that obstruction of the artery creates a swirling or eddy type of current in the blood flow, and in the carotid artery, and this affects the person's brain. The plaques in the arteries are not caused by a single episode of exertion, but Dr. Moore felt that stress and aging are factors which have a bearing upon the condition. It was this physician's opinion that the plaque causing Tidwell's difficulties had been present and steadily progressive before his first episode in Texas; that Tidwell's initial symptoms developed on the basis of aggravation from exertion; and that his exertion had required an increased oxygen supply in the brain. The following question was propounded and answer given by this doctor:

Q. Do you think becoming overheated would have had any effect on this condition by itself, just that one thing?

A. It could possibly. Certainly increasing body heat, increasing metabolism and increasing the need for oxygenation, and if a part is already at a point of tenuous supply, it's more or less the straw that broke the camel's back.

The doctor later stated:

A. * * * I think also, again going back to his history and perhaps wrongly assuming that

August Five would be in the summertime, knowing some relatively very limited information as to the stress that is required on bulldozer procedure, that the immediate cause of this patient's complaints as they were, blurring of vision, numbness of the left arm and leg, and, then, intermittent episodes of this was related to decrease in oxygen supply to the brain, and this in turn was due to the fact that he had a marginal artery in the first place to supply this. Therefore, I think stress is the thing that precipitated this man's problem.

\* \* \*

A. First of all, the plaque formation could have been increased by development of some soft clot, not complete; secondly, there could have been enough embarrassment of brain cell, and apparently were, was enough embarrassment of the brain cells for this patient to still be marginal in his ability to function, even at a more sedentary level of walking around, and I might say that I have recorded that he described this intermittent episode of numbness of the left arm and leg, that he felt it was more pronounced at a period of exertion than he did it recurring at other times.

The only other medical testimony of any significance was that of Dr. Reed who testified that heat precipitated Tidwell's partial paralysis, and that he would not have advised a man with Tidwell's condition to be out in the hot sun driving a bulldozer. Dr. Reed did say that one with Tidwell's condition, whose blood circulation to the brain was substantially decreased, would suffer a minor stroke or strokes and have damage to the brain which might be evidenced by sudden aging, or a complete change of personality.

The closest analogy in our cases where awards are based on aggravation of a pre-existing condition are those where heart disease is involved. In most of them,

the only real difference seems to be that the atheromatous plaques resulting from arteriosclerosis are localized in the arteries around the heart rather than in the carotid arteries as is the case here. Any obstruction resulting from these plaques seems to cause a deficiency in the oxygen supplied by the blood which affects the heart in one case and the brain in the other. The result is a heart attack or a stroke, of varying intensity, depending to some extent upon the extent and duration of the obstruction.

We have found substantial evidentiary support for awards in heart cases upon even less certain medical testimony. See *Kearby* v. *Yarbrough Brothers,* 248 Ark. 1096, 455 S. W. 2d 912; *Bradley County* v. *Adams,* 243 Ark. 487, 420 S. W. 2d 900. We found "accidental injury" where there had been a collapse on the job resulting from unusual exertion or strain by a worker having a pre-existing ailment in such cases as *Dougan* v. *Booker,* 241 Ark. 224, 407 S. W. 2d 369. This case is closely parallel to *Reynolds Metals Co.* v. *Cain,* 243 Ark. 483, 420 S. W. 2d 872, involving a disability from a myocardial infarction. There the claimant twice had to quit his work because of pains in his chest and arms. The medical testimony supporting the claim was to the effect that the claimant's exertion on the job placed demands upon his heart which could not be met by his arteries which were diseased because of arteriosclerosis and that this might well have aggravated a pre-existing coronary insufficiency, the ultimate result of which was precipitation of a myocardial infarction. In another such case, we found substantial evidence of causation in medical testimony that an employee's work activities before he became ill, particularly longer than usual hours, may have contributed to his massive coronary occlusion due to arteriosclerosis from which he had suffered for about five years. The doctor there, on cross-examination, stated that in his personal opinion he thought that the work of that day was a contributing factor. *Georgia-Pacific Corporation* v. *Craig,* 243 Ark. 538, 420 S. W. 2d 854. Of course, we have long held that any work aggravation of an existing arterial disease which hastens either injury or death is compensable as

arising in the course of, and out of, the employment. *Reynolds Metals Co.* v. *Cash,* 239 Ark. 489, 390 S. W. 2d 100. It is consistent with our holdings in these cases involving heart ailments due to arteriosclerosis to say that the testimony of the physicians, relating to precipitation of a partial paralysis and the likelihood of brain damage (or embarrassment of brain cells) because of demands for increased oxygen supply to the brain brought on by stress and unusual exertion by Tidwell in the conditions under which he was working, constitutes substantial evidence of aggravation or acceleration of his pre-existing condition resulting in some injury or damage to support a finding of causal connection, insofar as his disability is concerned. It must be remembered that as yet there has been no finding that Tidwell suffered any permanent disability as a result of this aggravation or acceleration of his condition.

The judgment is affirmed.

HARRIS, C. J., dissents.

BYRD, J., dissents only as to the question of jurisdiction.

CARLETON HARRIS, Chief Justice, dissenting. I do not reach the question of jurisdiction, since it is my opinion that claimant did not suffer a compensable injury. Tidwell's difficulties were occasioned by diseased carotid arteries, and from the way I read the record, the work he was doing only caused the *symptoms* of that disease to appear. The numbness he described and the blurring of his vision were simply symptoms of a partially blocked artery, and in fact, these symptoms enabled the correct medical diagnosis to be made. I cannot find from the record any disability that he suffered. The disability occasioned by a blocked artery is a stroke, and no one contends that Mr. Tidwell suffered a stroke. In fact, in the testimony of the physician relied upon by appellee, Dr. Jim Moore, there is frequent use of the word, "symptoms". For instance, in his January 3, 1969, report, Dr. Moore described his diagnosis as follows:

"Basically, it is my feeling that this patient, although he had some pre-existing atheromatous plaque in the carotid arteries, had an aggravation *of his symptoms* [My emphasis] by the exertional episodes required in his working activities as outlined and as occurred on or about August 5, 1968."

Further:

"I don't think the plaque itself was caused by a single episode of exertion; stress, aging, all of these factors have to bear. I think this patient's *symptoms,* [My emphasis] as they developed, were on a basis of aggravation from exertion."

Still further:

"I feel this plaque had been present for an indefinite and undetermined period of time, had been steadily progressive, likely. Probably, certainly, had been there before this episode, but I think that the fact that the exertion tended to require an increase in oxygen supply to the brain, it's most likely to cause this patient's initial *symptoms,* [My emphasis] so far as the history as was given to me."

It is interesting to note that during a six weeks period when Tidwell was not working at all, he still complained that his arms and legs were "going to sleep" and his vision was not good. I repeat that these were simply symptoms of the disease, which had progressed at that time to an extent that these symptoms appeared at rest as well as at work.

I would reverse.