W. SHANHOUSE & SONS, INC. *v.* SIMMS.

5-414                                   272 S. W. 2d 68

Opinion delivered October 18, 1954.

[Rehearing denied November 22, 1954.]

*Goodwin & Riffel,* for appellant.

*Weisenberger & Wilson,* for appellee.

ARNOLD M. ADAMS, Special Justice. Appellee, Mabel L. Sims, predicates her claim for Workmen's Compensation award on the allegation that she acquired empyema by accidental injury which arose out of, and in the course of, her employment with W. Shanhouse & Sons, Inc., one of the appellants, hereinafter referred to as appellant. Her claim for compensation was denied by the single commissioner before whom it was tried, and his finding was sustained by the full Commission. The Circuit Court reversed the order of the Commission and directed it to enter an appropriate award in favor of appellee; and from the judgment of the Circuit Court comes this appeal.

In reviewing this case and the Commission's opinion, we do so bearing in mind our firm rule that findings of fact by the Commission must be accorded the same force and effect as a verdict of a jury, and if there is any substantial evidence to support said findings of fact, Appellate Courts are bound thereby. When thus reviewed, we find the Commission erred in the following respects:

## I.

In finding as a fact that throughout appellee's employment she continued to perform her normal duties in the customary manner, specifically, the Commission wrote: ''It may be true that during the last months of

claimant's employment the tempo of her work was increased, she may have had more responsibilities and she may have done more work of a *similar nature* to that which she had done for several years for this employer.'' (Emphasis supplied.)

The evidence reflects that appellee was employed by appellant in July 1946, and after a short training period she was made supervisor in the sewing department of its Hope, Arkansas, plant, in which capacity she remained until her physical collapse on March 5, 1951. During the first years the working conditions were good and the work pleasant, she working 44 hours per week. The plant afforded reasonable working space and an abundance of aisles. She was responsible for training new operators and had the direct responsibility for the quantity and quality of the production of her department. During this early period there was a minimum of turnover in the operators, and the average number of female operators under her supervision was 40. Material for the operators and the finished product were moved about the plant on buggies through the aisles by bundle girls, with appellee moving the buggies occasionally, but at this time the buggies were not loaded heavily. During the year 1948, as a result of a so-called Penney contract, the work tempo increased, but appellee's duties were not substantially changed since she retained her experienced operators and bundle girls. In July 1950, she was off duty one week, three days of which she was in the hospital, and the medical testimony is that she suffered either from empyema of the left chest or pleurisy with effusion.

Early in 1950, the work load accelerated due to the Worstman contract, and again spiraled during December 1950, and January and February of 1951, due to an army contract. The free floor space heretofore existing was consumed by new machines, the aisles clogged and the work benches, heretofore about knee-high, were doubled in height. Instead of an average of 40 girls to supervise, this number ran to 95, 96 and 97 and there was a rapid turnover in personnel due to the hard work. Her superiors checked with her daily on the work production of

her operators, and the percentage of output by her department. To keep the operators busy, appellee carried the material to them and removed the finished product. The army jackets had a rayon lining and a wool innerlining and would be placed in bundles of two dozen and six, and each bundle weighed about 30 pounds. The stacking and restacking of the bundles, both on low benches and over her head on the buggies, which were equipped with side rails, exhausted appellee, requiring her to sit down and rest and to get her breath. The heavily laden buggies were difficult to get moving, often requiring two women, and this was taxing to her strength and was exhausting. During this army contract period, appellee did mostly lifting and heavy work, rather than supervising, and worked 9, 10 and 11 hours per day, 6 days per week. She requested the plant manager to relieve her of her arduous and overtaxing position and to give her an operator's assignment which would be less taxing and demanding physically, but she was denied. She did no work outside her employment and her domestic work was done by her daughter and a maid.

Mrs. Willie West and Mrs. William Fincher were also employed by appellant and corroborated the testimony of appellee as to her arduous physical labor and the strain of the work. Mr. John William Cleary, plant manager and witness for appellant, generally corroborated appellee's testimony, but in no instance did his testimony substantially contradict the Sims-West-Fincher testimony.

We conclude that the finding of fact by the Commission that appellee throughout her employment performed her normal duties in the customary manner is unsupported by any substantial evidence. On the contrary, all the substantial evidence shows crystal clear that during the months of December 1950, January and February of 1951, the nature of her work changed from that of a supervisory capacity to that of performing arduous physical labor to such an extent that it was overtaxing and an undue strain upon her physically, resulting in her collapse on March 5, 1951. The Commission's finding not being supported by

any substantial testimony, such finding must be, and is, disapproved.

## II.

In finding that appellee's work did not bring about her disabling condition, and that the Commission's independent study of medical literature did not bear out her medical evidence, specifically, the Commission wrote: "Even if this be true [increased work] we are not convinced that this work brought about her disabling condition . . . All the medical literature studied independently does not bear out the claimant's medical evidence . . . ."

The medical evidence reflects that Dr. L. M. Lile, by affidavit, stated he examined appellee in March 1951, and she had empyema of the left chest; and that her work was not the cause of her trouble, but it was his opinion that the condition was greatly aggravated thereby. Dr. Charles R. Gowen, a specialist in diseases of the chest, testified that, in his opinion, appellee suffered from pleurisy with effusion in July 1950, the aftermath being adhesions in the pleural region; that lifting, pulling and heavy physical labor done by appellee, irritated said pleural adhesions, causing them to weep and develop a fluid which created a base for the development of empyema; that said work, lifting, pushing and heavy physical labor was a cause of her condition; that he doubted seriously if her condition would have arisen had she performed work of the nature described during the first years of her employment; that she would not have collapsed on March 5, 1951 had she continued to perform the duties as noted in her first years of employment; and that, in his opinion, she would still be working. Dr. John C. Crenshaw, the surgeon who operated on appellee, corroborated Dr. Gowen's testimony that appellee suffered from a pleural infection aggravated by her working, and that said aggravation was to such an extent it caused her physical collapse.

The testimony of Drs. Lile, Gowen and Crenshaw constituted all the medical testimony in this case. Their opinions were based on academic training in the medical

profession, years of experience in the practice of medicine, and pathological studies from specimens from the chest of appellee. Whether appellee had empyema or pleurisy with effusion in 1950, whether said disease left pleural adhesions, whether lifting and arduous physical labor would cause said adhesions to weep thereby creating a base in which empyema could develop, whether the labor performed by appellee either caused or aggravated the empyema, and whether appellee would or would not have collapsed had she continued to perform the duties of the first few years of her employment, are inquiries addressed peculiarly to the realm of scientific knowledge, and is not the sort of determination the Commission could make independently and in defiance of all the medical testimony in the record. *Larson's Workmen's Compensation,* Vol. 2, 1952, § 79.54. Hence, the Commission's finding that appellee's work did not bring about her condition, and in accepting its own independent medical conclusions in defiance of the testimony of Drs. Lile, Gowen and Crenshaw was erroneous, and must be, and is, disapproved.

### III.

In finding that appellee did not sustain a disability by accidental injury which arose out of, and in the course of, her employment, specifically, the Commission wrote: "Even if this be admitted (muscle movements irritating the pleural adhesions), it cannot be established that the cause of such arose out of the employment in distinction with arising outside the employment." And ". . . that this [use of the muscles] occurred over a matter of months and was the result of day to day movements of the muscles, and not the result of any specific strain, movement or incident." In construing the Workmen's Compensation Act, our cases are precise to the point that in this jurisdiction we do not require an injured workman to point specifically to a single incident before he can be heard before the Commission or our Courts. We have long adhered to the rule that an accidental injury may stem not only from a specific incident or a single impact,

but also may result by a continuation of irritation upon some part of the body. *Batesville White Lime Co., et al. v. Bell,* 212 Ark. 23, 205 S. W. 2d 31. Neither do we require the injured workman to make inescapable proof that said accidental injury occurred on a date certain. A reasonably definite time is all that is required. *Murch-Jarvis Co., Inc., et al.* v. *Townsend,* 209 Ark. 956, 193 S. W. 2d 310. Our cases also point to the rule that an aggravation of a preëxisting disease resulting in death or disability is compensable. *Murch-Jarvis Co., Inc., et al.* v. *Townsend, supra.* The conditions under which appellee worked, the change of her duties from that of a strictly supervisory nature to that of arduous labor and physical strain, the undisputed testimony that appellee did no work outside her employment and her domestic chores were performed by her daughter and a maid, the undisputed testimony of the doctors that said labor and strain either caused or aggravated her condition and resulted in her physical collapse, when considered together with the balance of the substantial facts and circumstances of this case, make a case of accidental injury arising out of, and in the course of, her employment. *Scobey* v. *Southern Lumber Co.,* 218 Ark. 671, 238 S. W. 2d 640, and *Triebsch* v. *Athletic Mining & Smelting Co.,* 218 Ark. 379, 237 S. W. 2d 26.

Lastly, we observe that appellant also defended on the ground that the Statute of Limitations barred appellee from being heard. The Commission took cognizance of this defense in its Statement of the Case. The Circuit Court held contra. Suffice to say, appellant has not made any argument on that point in its Brief, and by our familiar rule, the point is treated as abandoned. *Purifoy* v. *Lester Mill Co.,* 99 Ark. 490, 138 S. W. 995.

The judgment of the Circuit Court is affirmed.

ED. F. McFADDIN, J., disqualified and did not participate in the consideration or determination of this case; GRIFFIN SMITH, C. J., J. S. HOLT and GEORGE ROSE SMITH, JJ., dissenting.