BRADLEY COUNTY ET AL *v.* SAMUEL ADAMS

5-4343                                    420 S. W. 2d 900

Opinion delivered November 20, 1967

*Smith, Williams, Friday & Bowen;* By: *Boyce R. Love,* for appellants.

*Paul K. Roberts,* for appellee.

GEORGE ROSE SMITH, Justice. The Workmen's Compensation Commission entered an award granting compensation to the appellee for ten weeks of total disability, together with medical expenses, attributable to a heart attack suffered in the course of his employment by Bradley County. The circuit court affirmed the award. The only question here is whether there is substantial evidence to support the Commission's conclusion that there was a causal connection between the claimant's work and his disability.

On the morning of June 7, 1966, Adams assisted the foreman of the county bridge crew in dismantling a bridge made of heavy timbers. The day was hot, and the work hard. Shortly before noon Adams suffered chest pains that proved to be the onset of his disabling heart condition. That afternoon Adams quit work early and was taken by his wife to a hospital, where he was treated by Dr. Whaley, the only medical witness who testified.

Dr. Whaley's deposition was taken on interrogatories. Counsel for the claimant propounded a detailed

question which summarized Adams's activities just before his illness and asked whether in Dr. Whaley's opinion those activities had been a contributing factor in the onset of the attack. Dr. Whaley answered: "The term used by doctors in this sort of case would be that the physical exertion is a *precipitating* factor, a term very close to the word contributing."

A cross-interrogatory asked if it isn't "highly unlikely that work on the day of the occurrence of the chest pains had any causal relation to the pains?" The answer: "No. The basic lesion had to develop slowly, but it is entirely possible that the *precipitating* event was a more vigorous heart action and flow rate through the diseased artery due to increased workload on the day in question." ...

The final cross-interrogatory read: "From all you know about this case, in your opinion, did the work on the day in question have any causal relation to the incomplete blockage of coronary blood flow?" Dr. Whaley answered: "As a simple matter of fact, I do not know, and to state an opinion on that basis would be foolish. I understand that the Commission has to determine one way or the other, but there is no clear *medical* reason for me to have an opinion."

Dr. Whaley's testimony is evidently open to two interpretations. On the one hand, he expressed the opinion that the claimant's work was a *precipitating* factor in the onset of the attack. Dr. Whaley twice underlined the the word precipitating. Webster's Second New International Dictionary defines precipitate as "to hasten the occurrence of; as, to *precipitate* a journey, or a conflict." That is plainly the sense in which the witness used the word.

It is true that Dr. Whaley also declared that, as a simple matter of fact, he did not know whether the required causal connection existed. But the Commission were at liberty to take that statement to mean merely

that the doctor was unwilling to express complete certainty about a matter not admitting of such an inflexible view. We considered a similar situation in *American Life Ins. Co.* v. *Moore*, 216 Ark. 44, 223 S. W. 2d 1019 (1949), where we said:

"Appellant insists that Dr. Monroe's testimony is speculative, since he admitted the possibility that death was due to some other cause. But medicine, like the law, is not an exact science. If mathematical certainty were required, a surgeon would act at his peril in advising his patient to undergo an operation. The law does not compel adherence to a standard so precise. The effect of Dr. Monroe's testimony is that in his opinion the most probable cause of death was a pulmonary embolism attributable to the fractured leg. . . No alternate theory has been proposed by appellant. We are unwilling to say that Dr. Monroe's testimony is conjectural merely because his opinion did not preclude every other possible cause of death." In the case at bar the Commission was also justified in considering the fact that Adams's attack occurred under circumstances strongly indicating that it was work-connected.

We have held, in cases too numerous to mention, that it is not our province to decide contested issues of fact in compensation cases, that it is the responsibility of the Commission to draw inferences when the testimony is open to more than a single interpretation, and that the Commission's findings have the force of a jury verdict. Those principles demand that the Commission's decision in the case at hand be upheld.

Affirmed.

BROWN and FOGLEMAN, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. In view of the testimony in this case, I am compelled to register my dissent from the action of the majority.

There is no presumption that a claim for compensation benefits comes within the provisions of the workmen's compensation law. *Duke* v. *Pekin Wood Products Co.,* 223 Ark. 182, 264 S. W. 2d 834. In reiterating previous holdings that the burden is on the claimant to show a causal connection between an employee's heart attack and his work, this court has said that any change in that rule is a matter for the legislature and not the judiciary. *Auto Salvage Company* v. *Rogers,* 232 Ark. 1013, 342 S. W. 2d 85. I fear that the action of the majority in this case very nearly abrogates that position and amounts to a virtual change by this court. If the claimant actually still bears this burden, then I cannot see how the judgment in this case can be affirmed. The only testimony by which claimant sought to meet this burden was that of Dr. William C. Whaley. If his testimony does not constitute substantial evidence to support the finding of the Workmen's Compensation Commission, we should reverse. His testimony on the causal connection is as follows:

INTERROGATORIES PROPOUNDED TO DR. W. C. WHALEY

"No. 16: What did you diagnose his illness as being on June 7, 1966?

Answer: *Possible* coronary occlusion.

\* \* \*

No. 18: Will you please define what *coronary insufficiency* is?

Answer: Coronary insufficiency means a reduction of blood flow through the coronary arteries usually caused by narrowing of the lumen of the vessel *as a result of arteriosclerosis.* Clinically, *this results in substernal chest* pain intermittently. There is also an alteration of the ECG pattern from the normal. In other words, there is *INCOMPLETE\** blockage of the coronary artery blood flow.

* * *

No. 21: Do you have an opinion based upon reasonable medical certainty as to the cause of Mr. Adams' trouble?

Answer: *Coronary arteriosclerosis.*

No. 22: In your opinion, was the coronary insufficiency caused by an insufficient amount of blood being brought to the heart or was it some other cause?

Answer: Yes

No. 23: Is it true that a person engaged in physical activity requires more circulation or more oxygen brought to his heart?

Answer: Yes

No. 24: Could you determine from your examination whether Mr. Adams had a narrowing of any artery or any other pre-existing condition which would make him *susceptible to symptoms of coronary insufficiency* if Mr. Adams engaged in any strenuous work?

Answer: By inference only, one assumes that an atheromatous lesion must have existed in the walls of Mr. Adams coronary arteries before the actual attack, because these plaques grow slowly as a gradual accumulation; they do not suddenly appear. [Emphasis mine. *Emphasis by witness.]

No. 25: Will you state what drugs or treatments you prescribed for Mr. Adams and what result the drugs or treatments were intended to bring about?

Answer: Mr. Adams' primary treatment was in the form of a vasodilating drug to try to enlarge the functional capacity of his coronary arteries in carrying blood to the muscle of the heart.

No. 26: You, as Mr. Adams' physician, know more about Mr. Adams' physical condition before June 7, 1966, and after June 7, 1966, than any other person I know. Therefore, I would like to ask you this question: Assuming that a man who is 57 years of age and who is in Mr. Adams' physical condition as on June 7, 1966, were to engage, with the help of one more laborer, in the carrying of pieces of lumber weighing from 100 pounds each, and upward, for a distance of 20 feet, from approximately 8:30 o'clock, A.M., to 9:00 or 9:30 o'clock, A.M., and the weather was abnormally hot, and this worker would *sustain an attack of coronary insufficiency* during the carrying of the lumber or immediately after, would this activity having been engaged in by the worker, in your opinion, be a contributory or contributing factor in the onset of the *attack of coronary insufficiency*?

Answer: The *term used* by doctors in this sort of case *would be* that the physical exertion is a *PRE-CIPITATING** factor, a term very close to the word contributing." [Emphasis mine. *Emphasis by witness.]

CROSS-INTERROGATORIES PROPOUNDED TO DR. W. C. WHALEY

1. "After reading your answers to the Interrogatories propounded by the claimant, it is my understanding that it is your *opinion that his chest pains were caused by an incomplete blockage* of the coronary artery blood flow and that this blockage was *a product of Arteriosclerosis, which is a condition that occurs over a long period of time.* Is this correct?

Answer: *Yes.*

2. If this is correct, then since the problem was caused by long, gradual accumulation, isn't it highly unlikely that work on the day of the occurrence of the chest pains had any *causal relation to the pains*?

Answer: No. The basic lesion had to develop slowly, but it is entirely possible that the *PRE-CIPITATING** event was a more vigorous heart action and flow rate through the diseased artery due to increased work load on the day in question. [Emphasis mine. *Emphasis by witness.]

3. Isn't it true that Mr. Adams gave you a history of doing work on the day in question which was no different than his normal work and that, in fact, on the day in question, he had completed the heavy work, eaten his lunch and was engaged in driving a truck, a relatively easy task, when he experienced the pain?

Answer: Yes.

4. From all you know about this case, *in your opinion, did the work* on the day in question have any *causal relation* to the incomplete blockage of coronary blood flow?

Answer: As a simple matter of fact, *I do not know,* and *to state an opinion on that basis would be foolish.* I understand that the Commission has to determine one way or the other, but *there is no clear MEDICAL** reason for me to have an opinion."* [Emphasis mine. *Emphasis by witness.]

It is notable that Dr. Whaley *nowhere* expresses *any opinion* that claimant's heart attack was caused by his work. As a matter of fact, the conclusion seems inescapable that he carefully and deliberately avoided doing so. When he first mentioned physical exertion as a "precipitating factor," he avoided answering the question as to his opinion whether claimant's work activity was a contributing or contributory cause of the onset of an attack of coronary insufficiency. That coronary insufficiency is not a damage to the heart, but is a result of arteriosclerosis evidenced by pain, is shown by the doctor's answer to the request for a definition. So whatever construction be put on the doctor's answer, he has

never stated *any* opinion that the claimant suffered a disabling heart attack caused by his work. While he did say that he diagnosed Adams' trouble as "*possible* coronary occlusion," [Emphasis mine.] he gave his opinion that coronary arteriosclerosis was the cause.[1] This certainly is a cause other than the work and is a condition that is not and cannot be brought on by work. It occurs over a long period of time. There can be no question about this in view of the doctor's answer to cross-interrogatory no. 1. His answer to cross-interrogatory no. 2 simply establishes that it is not unlikely that the work had something to do with claimant's *chest pains*. Here, again, the chest pains are not a disability, nor did they cause any disability. I cannot help but believe that the doctor understood all the questions and studiously avoided giving any answers except those he believed to be medically correct, but these do not establish any causal connection. If there was no clear medical reason for the doctor to have any opinion as to causal relation, how could the Commission make any finding of causation, not just of coronary blood flow, but of heart damage? The doctor was not only reluctant to express complete certainty, or to indicate a probable cause, he was positively unwilling to express any opinion at all.

In the case cited by the majority the doctor testified that the most probable cause of insured's death was pulmonary embolism attributable to a fractured leg. He clearly stated and reiterated an opinion that the death resulted from pulmonary embolism caused by accidental injury, even though he admitted on cross-examination that there are cases known to the medical profession in which pulmonary embolism has been caused other than by accidental injury or surgery. If that decision is the yardstick by which the sufficiency of the evidence is to be measured, Dr. Whaley's testimony still comes up con-

---

[1] In considering medical testimony, this court has recognized the significance of the use of the word "possible" rather than "probable" to describe the likelihood of causal connection. *Chapman* v. *C. Finkbeiner, Inc.*, 230 Ark. 655, 324 S. W. 2d 348.

siderably short. It was recognized in *W. Shanhouse & Sons* v. *Sims,* 224 Ark. 86, 272 S. W. 2d 68, that questions such as those presented here are peculiarly within the realm of scientific knowledge. It follows that, in order to meet the burden of proof, claimant's contention must be supported by medical testimony. Otherwise, the Commission members must sit as medical experts themselves and arrive at their own independent medical conclusions. In the *Shanhouse* case, this court said that they should not do so.

I recognize that we are not bound by decisions from other jurisdictions. It is obvious though that the great weight of authority supports my position on this testimony to such an extent that there is little dissent. It is the general rule that where evidence of causation of an injury or disease is required in cases where laymen have insufficient knowledge to enable them to say with any degree of certainty that the condition was caused or aggravated by the incident involved, a claimant fails to meet the burden of proof by merely showing by medical testimony that the incident "could have," "might have" or "possibly" caused the condition, but an issue of fact may be made only by evidence that the condition was "probably" or "to a reasonable certainty" the result thereof. As a corollary, testimony as to the "possibility" is not substantial evidence to support a finding of fact. See Annot., 135 ALR 516. Among the cases declaring this rule since the publication of the above annotation are:

Illinois: *Panepinto* v. *Morrison Hotel,* 71 Ill. App. 2d 319, 218 N. E. 2d 880 (1966).

Kansas:* *Bearman* v. *Prudential Ins. Co. of America,* 186 F. 2d 662 (10th Cir. 1951).

Missouri: *Leavitt* v. *St. Louis Public Service Co.,* 340 S. W. 2d 131 (Mo. 1960) [Not sufficient to justify instruction authorizing award of damages for permanent injury]; *Welker* v. *MFA Central Cooperative,* 380 S. W. 2d 481 (Mo. 1964) [Admissible, but

not substantial evidence]; *Bertram* v. *Wunning,* 385 S. W. 2d 803 (Mo. 1965).

North Carolina:* *Gillikin* v. *Burbage,* 263 N. C. 317, 139 S. E. 2d 753 (1965).

Oregon:* *Henderson* v. *Union Pac. R. Co.,* 219 P. 2d 170, (Ore. 1950); *Hawerton* v. *Pfaff,* 425 P. 2d 533, (Ore. 1966).

Ohio: *Brandt* v. *Mansfield Rapid Transit, Inc.,* 153 Ohio St. Rep. 429, 92 N. E. 2d 1 (1950).

Oklahoma:* *Cohenour* v. *Smart,* 240 P. 2d 91 (Okla. 1951).

South Carolina:* *Hines* v. *Pacific Mills,* 214 S. C. 125, 51 S. E. 2d 383 (1949); *Windham* v. *City of Florence,* 221 S. C. 350, 70 S. E. 2d 553 (1952).

Utah: *Moore* v. *Denver & Rio Grande Western R. Co.,* 4 Utah 2d 255, 292 P. 2d 849 (1956).

Washington:* *Arthurs* v. *National Postal Transport Asso.,* 49 Wash. 2d 570, 304 P. 2d 685 (1956); *Bland* v. *King County,* 55 Wash. 2d 902, 342 P. 2d 599 (1959).

Wisconsin:* *Meyer* v. *Fronimades,* 2 Wis. 2d 89, 86 N. W. 2d 25 (1957).

Not only did this court indicate recognition of the rule in *Chapman* v. *C. Finkbeiner, Inc.,* as pointed out in the footnote, but it has further indicated its concurrence when it approved the following conclusion of law stated by the Workmen's Compensation Commission: "The claimant is not required to establish proof of the cause of the death to a mathematical certainty, but when the *probable* cause of death is established to a reasonable *certainty,* the burden of proof has been discharged." *Quality Excelsior Coal Co.* v. *Maestri,* 215 Ark. 501, 221 S. W. 2d 38. [Emphasis mine.]

---

*These states were not listed as supporting the general rule in the annotation.

While we are not triers of fact, we should not shirk our responsibility to look behind the finding of the Workmen's Compensation Commission to determine whether it is supported by evidence. In this case, not only is the evidence of cause insubstantial, it is non-existent. If we go traipsing down the path opened in this case, workmen's compensation will become general industrial insurance in heart cases, covering not only "heart attacks" but arteriosclerosis.

I would reverse the trial court and the Commission.

I am authorized to state that Brown, J., joins in this dissent.