MACK SNEED v. COLSON CORPORATION

73-48                                       497 S.W. 2d 673

Opinion delivered July 23, 1973
[Rehearing denied August 27, 1973.]

*Erwin, Bowie & Boyce,* for appellant.

*Frierson, Walker, Snellgrove & Laser,* for appellee.

J. FRED JONES, Justice. This is a workmen's compensation case in which Mack Sneed, the injured workman, was awarded compensation benefits by the Workmen's Compensation Commission. The circuit court reversed the Commission and the claimant Sneed is the appellant here.

The facts appear as follows: The appellant Sneed was 42 years of age and had been employed as a punch press operator by the respondent-appellee-employer for a period of six years, when on November 19, 1970, he sustained an injury to his right hand when two of his fingers were caught in the punch press. The initial injury resulted in partial amputation of the fingers on the right hand for which compensation benefits were fully paid without controversion. Mr. Sneed returned to work for the same employer in the latter part of January, 1971, but was forced to cease work again in July, 1971, because of pain he was experiencing in his neck, shoulders and arms. He later had surgery on his cervical spine and was off work from July 17 to November 29, 1971.

Mr. Sneed filed claim with the Workmen's Compensation Commission for his additional disability because of the neck condition and a hearing was had thereon before a Referee on February 3, 1972. Mr. Sneed was awarded compensation benefits from July 17, 1971, until November 29, 1971, and was awarded a five per cent permanent partial disability to the body as a whole. Upon review of the Referee's award, the full Commission made the same award and upon appeal to the circuit court the court found no substantial evidence in the record to sustain the award and reversed the order of the Commission.

The question before the Commission was whether or not the condition suffered by Mr. Sneed in the cervical area of his spine was a result of his accident on November 19, 1970, when his hand was injured. The Commission

found that it was so related and awarded compensation benefits accordingly. The Commission was required to make its determination on the preponderance of the evidence with reasonable doubts resolved in favor of the claimant. On appeal to the circuit court and to this court the only question for determination is whether or not there was any substantial evidence to sustain the Commission's finding and we, of course, in examining the evidence for such determination, must view it together with all reasonable inferences deducible therefrom, in the light most favorable to the Commission's finding the same as in a jury verdict. *Northwestern Nat'l Ins. Co. v. Weast,* 253 Ark. 710, 488 S.W. 2d 322; *Warwick Electronics* v. *Devazier,* 253 Ark. 1100, 490 S.W. 2d 792.

Turning now to the pertinent evidence in the case at bar, Mr. Sneed testified that he had been working as a punch press operator for the appellee Colson Corporation for approximately six years and had never had any difficulty with his neck, arms and shoulders, and had never had any difficulty performing the duties of his employment until his injury on November 19, 1970. His testimony in this regard is not disputed and is in fact substantiated by his supervisor as well as fellow-employees.

Mr. Sneed testified that a safety device in the form of a harness was attached to his arm at the time of his injury and that this mechanical device pulls, or jerks, his hand back from the machine as the press comes down on the materials being processed. It appears that this safety device is synchronized with the operation of the machine but in Mr. Sneed's case his fingers were caught in the machine and the safety device continued to jerk his arm while his hand was caught in the machine resulting in the ends of his fingers being mashed off and tendons being pulled out of his hand and wrist.

Mr. Sneed testified that he jerked his neck in one direction and his shoulders in another in attempting to release himself from the machine and the safety device, and that his neck and arms bothered him and grew progressively worse from the date of the accident up until he was forced to quit work because of it in July, 1971. Several of his fellow-employees testified as to his complaints of pain in his neck and arms after he returned to

work following the accident and the termination of the healing period relating to his hand.

Mr. Sneed said he made several requests of his employer for examination by a company doctor, Dr. Mahon, but that his employer refused his requests. He testified that when he finally was forced to cease work, he went to his family doctor, Dr. Robinette; that Dr. Robinette recommended he stay off from work on sick leave but that when he presented Dr. Robinette's written recommendations to his employer and requested that his compensation payments and medical treatment be reinstated, his request was denied. He said he went to Dr. Robinette two or three times during which x-rays and other tests were made and he was referred to Dr. Grant, an orthopedic surgeon in Memphis. He said he was under treatment by Dr. Grant until sometime around November 25th or 29th, during which time Dr. Grant performed surgery on his cervical spine. He said he later was seen by Dr. Austin Grimes in Little Rock. He said that following the surgery on his cervical spine he was able to return to work on November 29, 1971; that he had been off from work because of his cervical condition from July 17, 1971, until November 29, 1971. He testified he was still having difficulty with his neck and arms.

Dr. Larry Mahon, an orthopedic surgeon, examined and treated Mr. Sneed immediately following the injury to his hand on November 19, 1970. He said that the last time he saw Mr. Sneed in reference to his hand was on January 27, 1971. He said that Mr. Sneed made no complaints to him about difficulty with his arms, except he did complain considerably with his right forearm where one of the large finger tendons had been avulsed from the remainder of the finger and wrist. Dr. Mahon was advised that subsequent examinations and surgery revealed a "bar formation" at C-6 on the left with a central disc immediately beneath the egress of the nerve at that level and was questioned in this connection. He defined "bar formation" as a "bridge of osteoarthritis—we frequently describe spurring in the cervical and lumbar spines." He said that "bar formation" is not normally traumatic in origin but is an osteoarthritic process secondary to normal aging process. He said it was not unusual for a bar formation to normally produce symptoms of pain in the neck and arms and that this would

be true without regard to whether there had or had not been trauma. Dr. Mahon then testified that he examined Mr. Sneed in his office at the request of the attorney for the appellee-employer on December 2, 1971, and found the condition he would normally expect following surgery such as Mr. Sneed had undergone on the cervical spine. He said that in his opinion Mr. Sneed had a permanent partial disability of no greater than five per cent to the body as a whole because of the disability of the cervical spine.

On cross-examination Dr. Mahon said that many people suffered osteoarthritic conditions in the cervical spine such as he found in Mr. Sneed without having any symptoms of pain. He said that in many cases when a person with such condition suffers trauma to the area, the condition may become symptomatic and that such condition may be aggravated by a jerking type of injury to the neck and back. Then Dr. Mahon testified as follows:

"Q. And although I believe you stated this was not related to the injury to the hand—if you were given the background which you have, I think, have now been given—if you were given the background of a jerking type trauma to the neck and back, would not this be consistent with the injury that you have now found to exist in the cervical spine and resulting from this bar formation?

A. That is correct."

In Dr. Mahon's report of December 17, 1971, addressed to the respondent-appellee's claims representative pertaining to his examination of Mr. Sneed on December 2, 1971, he states as follows:

"Following the last narrative report to you on February 12, 1971, please be advised that I did see Mr. Sneed back in my office on December 2, 1971, for further evaluation. His injured right hand, with the amputation of the two fingers, was doing satisfactroily and in my opinion there is still the same decree of disability existing as I stated in my earlier correspondence. At the time of this examination, Mr. Sneed

stated that he actually had been having difficulty with his neck and left arm from the onset of his original injury to his hand but did not mention any complaints referrable to that area to me during that period of time, from 11/17/70 to 1/27/71. The history I obtained from Mr. Sneed from his office visit on 12/2/71, he stated that he had jerked his neck at the time of his original injury to his hand and that he had difficulty with the area since that time. He did have a cervical laminectomy performed by Dr. Grant and he states that he has improved since the laminectomy although he still complains of parethesia's in the left arm and stiffness and soreness in his neck. He does have legitimate sounding complaints for a post laminectomy status. Apparently Mr. Sneed, according to the office notes of Dr. Grant which accompanied him, did have a discogenic problem in his cervical spine, however, a ruptured cervical disc was not removed because of technical difficulties.

I am unable to state whether or not Mr. Sneed's alleged cervical spine injury is a direct result of the original injury in question at this time although throughout his treatment by myself, he did not complain of any symptomatology referrable to his neck or his left arm. His complaints were always involving the right upper extremity. It is, however, theoretically possible that at the time of the original injury sufficient force could have been exerted on his cervical spine through a jerking mechanism to rupture a cervical disc. I feel that Mr. Sneed's present complaints with his cervical spine are probably on a legitimate basis from cervical arthrosis from the cervical disc problem which he had plus the necessary ensuing surgery. However, I believe the degree of permenent partial disability to his body as a whole as a result of the cervical spine problem is no greater than 5%. As I just mentioned, however, I can not state unequivocally that there is a causal relationship between the original injury and the cervical spine problem. However, if one assumes his history is accurate then and it would be theoretically possible."

Dr. Grant's report dated July 23, 1971, pertaining to Mr. Sneed's surgery in the Methodist Hospital in Memphis relates in part as follows:

"Admitted with history of having injured his neck and arm while at work. He has had pain in both upper extremities and recent pain in the left upper extremity is worse with associated numbness of the index finger and thumb.

Patient had EMG which revealed radiculopathy of C-7 on the left. Cervical·myelogram revealed defect at C-6 level on the left and also a defect at the C-5 level on the right. Patient was carried to surgery (after a trial of cervical traction failed to alleviate his symptoms) and a cervical laminectomy was performed. Findings at surgery revealed a bar formation at C-6 on the left with a central disc immediately beneath the egress of the nerve root at that level. The disc could not be removed due to the swelling of the nerve root on that side which permitted traction of the root. However, a foraminotomy was performed over the root and post-op the patient was improved."

A report of Dr. Austin Grimes to the Little Rock Orthopedic Clinic dated June 30, 1971, relates as follows:

"The above 41 year old white male was seen in the office on June 16, 1971, for purposes of evaluation of neck pain, right arm pain and pain into his right hand. He states he caught his right hand in a punch press and lost the end of his long and ring fingers. He has also pulled out a tendon around his wrist and forearm and jerked his neck and has been having pain in his neck since that time. He also has pain in his left arm now, for the past few months. This is especially noted when he has been working. He is having increasing difficulty. He gets a sleepy feeling in his thumb and index finger of the left hand and pain in the left wrist as well. He has pain in the dorsum of the left hand along the radial nerve distribution of sensation. He states he also has a fullness occurring over the right wrist at the point of insertion of the tendons which he thought were pulled out. He thought the left arm pain was heart pain and was seen by Dr. Hickman in Jonesboro and has not been to Doctor Mahon, the treating doctor, for his hand or his neck pain since the ini-

tial injury and initial immediate post operative care. He was scheduled to see Doctor Mahon, but has not been back to him as yet. His past history is significant. He denies any difficulty with his arm, hand or neck prior to the accident.

\*   \*   \*

X-rays of the cervical spine, AP, oblique and lateral of the right hand, reveal some C5-6 narrowing as well as some encroachment of the left oblique view of the nerve root level of C3-4 and on the right oblique there is C5-6 foramenal encroachment. . . ."

The appellee contends that expert medical testimony is essential to establish causal relationship of the injury to the cervical condition suffered by Mr. Sneed and seems to argue that the Commission must rely on medical evidence only for such purpose. The appellee cites in support of this premise *W. Shanhouse & Sons, Inc.* v. *Simms,* 224 Ark. 86, 272 S.W. 2d 68, but in *Shanhouse* we did not go as far as the appellee seems to conclude. In the *Shanhouse* case the question was whether or not the claimant was suffering from empyema resulting from effusion and adhesions in the plural region caused by heavy lifting in the course of her employment. In that case the Commission totally ignored the testimony of the medical experts and rendered its opinion on its own independent study of the medical literature on the subject. We certainly did not approve such procedure in *Shanhouse* but neither did we say that expert medical testimony is essential to establish causal relationship between an industrial injury and every resulting condition that may arise therefrom.

Certainly we recognize that expert medical opinion and evaluation would be desirable and perhaps beneficial to the Commission in most any type of case where physical injury is involved. Indeed it is just common sense that medical evidence may be essential to a determination of causal relation between some types of injury and some types of physical conditions following such injuries. We also recognize that expert medical testimony is expensive to an injured workman and is not essential to the exclusion of all other evidence in establishing a

causal relation between some types of injury and some types of conditions following such injuries.

We disagree with the trial court's determination that there was no substantial evidence to sustain the finding of the Commission in this case. The mechanics and history of the accident in which Mr. Sneed was injured were firmly established by all the evidence on the subject. As we read Dr. Mahon's testimony, he does not say there was no relation between the accident and Mr. Sneed's admitted disability from the condition in his cervical spine. Dr. Mahon recognizes his inability to state *unequivocally* that there was a causal relationship between Mr. Sneed's original injury and his spinal problem, but he does say that if the history is accurate, then the relationship would be possible. Dr. Mahon further states:

> "Apparently Mr. Sneed, according to the office notes of Dr. Grant which accompanied him, did have a discogenic problem in his cervical spine, however, *a ruptured cervical disc* was not removed because of technical difficulties. * * * It is, however, theoretically possible that at the time of the original injury sufficient force could have been exerted on his cervical spine through a jerking mechanism to rupture a cervical disc. I feel that Mr. Sneed's present complaints with his cervical spine are probably on a legitimate basis from cervical arthrosis from the cervical disc problem which he had plus the necessary ensuing surgery." (Emphasis added).

As we view the record in this case, there is no contention that the "bar formation at C-6" was sustained in the accident on November 19, 1970, but as we read the record, the "bar formation" as such, is not causing the disability. As we read and interpret the medical reports, the bar formation simply added to the "technical problem" which prevented the removal of the ruptured disc.

> "Findings at surgery revealed a bar formation at C-6 on the left with a central disc immediately beneath the egress of the nerve root at that level. The disc could not be removed due to the swelling of the nerve root on that side which permitted traction of the root."

We conclude that the judgment of the trial court should be reversed and the order and award of the Commission should be reinstated and affirmed.

The judgment is reversed.

BROWN and FOGLEMAN, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I dissent because I think this decision licenses the Workmen's Compensation Commission to make awards based on speculation as to causes of disability. It seems evident, without necessity for elaboration, that a diagnosis of cervical radiculopathy, due to bar formation and soft disc at C-6 on left, requires explanation of cause, effect and symptoms by medical experts. This was the diagnosis by Dr. Grant of the Neurosurgical Group—the only physician who was in a position to state positively what caused the pain and discomfort suffered by the claimant. Dr. Grant did not testify but only filed a report. He did not express any opinion as to the cause of Sneed's condition. As a matter of fact, the only physician who did was Dr. Larry Mahon, Sneed's treating physician at the time of the injury. Dr. Mahon said that Sneed did not advise him of any symptoms of his disabling condition during the course of his two-month treatment and expressed the opinion that these symptoms should have appeared during that time if they were attributable to the injury. This doctor testified after having examined Sneed on December 2, 1971, and having had the benefit of other medical reports. He estimated that Sneed had a permanent partial disability of 5% because of his back condition. When asked to state his opinion as to whether or not this disability was attributable to the original injury, Dr. Mahon replied:

This was in no way related to the initial injury to his hand—this was an estimate of permanent partial disability to this cervical spine at the time that I saw and examined him on 12/2/71 taking in account the complaints that he had at that time.

Dr. Mahon expressed the opinion that Sneed's difficulty was attributable to a bar formation discovered through Dr. Grant's surgery. He stated that this condition

was not normally attributable to trauma, but that it is an osteoarthritic process secondary to the normal aging process and that it is not unusual for it to produce symptoms of pain in the neck and arms. He further stated that this bar formation had a tendency to produce the same type of symptoms. In earlier reports, which were made exhibits to his testimony, Dr. Mahon had stated that if one assumed the history given by Sneed after his treatment was accurate, it would be theoretically possible that sufficient force had been exerted on the cervical spine at the time of the original injury to rupture a cervical disc.

Thus, in considering a disability because of a condition in a human spine, one of the most intricate parts of the complicated human machine, the only medical evidence of causation is the admission of a theoretical possibility. Certainly,the relationship of cause and effect in this case cannot be said to be within the realm of common knowledge. The answer to the question is, beyond a shadow of doubt, peculiarly within the realm of medical science. There is evidence of another apparent cause—a normal aging process. While the medical expertise of the commission is presumptively superior to that of members of the judiciary, still I do not see how it could have reached the conclusion it did without resort to speculation and conjecture.

I will not repeat all that I have had to say on this subject in dissent in *Exxon Corporation* v. *Fleming,* 253 Ark. 798, 489 S.W. 2d 766; *Kearby* v. *Yarbrough Gin Co.,* 248 Ark. 1096, 455 S.W. 2d 912; and *Bradley County* v. *Adams,* 243 Ark. 487, 420 S.W. 2d 900, but much of it is at least equally applicable here.

I cannot understand the casual treatment given our decision in *W. Shanhouse & Sons, Inc.* v. *Simms,* 224 Ark. 86, 272 S.W.2d 68. This is what we said in that case:

Whether appellee had empyema with effusion in 1950, whether said disease left pleural adhesions, whether lifting and arduous physical labor would cause said adhesions to weep thereby creating a base in which empyema could develop, whether the labor performed by appellee either caused or aggravated the

empyema, and whether appellee would or would not have collapsed had she continued to perform the duties of the first few years of her employment, are inquiries addressed peculiarly to the realm of scientific knowledge, and is not the sort of determination the Commission could make independently and in defiance of all the medical testimony in the record. Larson's Workmen's Compensation, Vol. 2, 1952, Sec. 79.54. Hence, the Commission's finding that appellee's work did not bring about her condition, and in accepting its own independent medical conclusions in defiance of the testimony of Drs. Lile, Gowen and Crenshaw was erroneous, and must be, and is, disapproved.

Presently, the section cited from Larson in that opinion reads:

These considerations apply with particular force to the issue of disability. As has been stressed at length earlier, disability is not a purely medical question: It is a hybrid quasi-medical concept, in which are commingled in many complex combinations the inability to perform, and the inability to get, suitable work. Similarly, the compensation concept of disfigurement goes far beyond a mere objective physical condition, and is therefore a particularly appropriate subject for independent commission judgment that might be at variance with medical opinion.

Since these are the reasons for the rule relaxing the necessity for medical testimony, they should set the boundaries of the rule; in other words, reliance on lay testimony and administrative *expertise* is not justified when the medical question is no longer an uncomplicated one and carries the fact finders into realms which are properly within the province of medical experts.

Later, Professor Larson made this comment in 2 Workmen's Compensation Law 304, § 79.59 (1969):

\* \* \* The increasing tendency to accept awards unsupported by medical testimony should not be al-

lowed to obscure the basic necessity of establishing medical causation by expert testimony in all but the simple and routine cases—and even in these cases such evidence is highly desirable and is part of any well-prepared presentation.

Perhaps it is too late to reverse the trend toward judicial conversion of workmen's compensation into employee's health insurance. I cannot help objecting, because the question whether this should be done is one of public policy and, if done, it should be accomplished by other means.

I would affirm the judgment.

I am authorized to state that Mr. Justice Brown joins in this dissent.