## FIREMAN'S FUND INSURANCE CO. ET AL *v.* MALLIE HILL & LIBERTY MUTUAL INSURANCE CO.

73-74                                    498 S.W. 2d 865

Opinion delivered September 17, 1973

*Riddick Riffel,* for appellants.

*Penix & Penix,* by: *Bill Penix,* for appellees.

J. FRED JONES, Justice. The question before the Commission in this compensation case, was which of two insurance carriers is liable for temporary total disability from January 5, 1971, to February 18, 1972, and permanent partial disability in the amount of 50% to the body as a whole awarded to Mallie Hill as a result of a ruptured disc sustained in the course of her employment by Frolic Footwear.

Fireman's Fund Insurance Co. was the compensation carrier for Frolic until January 1, 1970, at which time Liberty Mutual Insurance Co. became the compensation

carrier. The compensability and amount of the award are not questioned. The specific question is whether the disability from a ruptured disc suffered by Mrs. Hill resulted from injury sustained prior, or subsequent, to January 1, 1970. The Compensation Commission found that it resulted from injuries sustained subsequent to January 1, 1970, and made the award against Liberty Mutual. On appeal by Liberty Mutual the circuit court found that the Commission had ignored the evidence of injury sustained in 1969 and the court failed to find any substantial evidence that the ruptured disc and resulting disability were caused by injury subsequent to January 1, 1970. The circuit court reversed the award of the Commission and remanded with directions to make the award against Fireman's Fund. The circuit court judgment recites in part as follows:

"According to the record herein the claimant sustained injuries to her back November 5, 1969, while pulling a rack of shoes.

Subsequent to that date claimant has suffered severe back injuries aggravating her condition, including but not limited to her injuries in lifting boxes in August, 1970, and pulling the racks in December, 1970, all of which ultimately required surgery in 1971 to correct.

\* \* \*

The Court finds that the claimant's injuries primarily began with the back injury on November 5, 1969, and that the injuries of 1970, as well as the other injuries, were in aggravation of the 1969 injury; that there was no substantial evidence to support the Referee or Commission in ignoring the injury of November, 1969, and accepting in lieu thereof an injury of a later date; that disability should begin with the 1969 injury."

On appeal to this court Fireman's Fund contends that there was substantial evidence to sustain the award of the Commission and the circuit court erred in holding otherwise.

Both sides recognize the well-established rule that an award of the Workmen's Compensation Commission has the same force and effect as a jury verdict and must be affirmed on appeal if there is any substantial evidence to support it. The question on appeal is not what decision the circuit court or this court would have reached on trial de novo; nor is the question on appeal whether there is substantial evidence to sustain a different award than the one made. The question on appeal is whether there is any substantial evidence to sustain the decision or award the Compensation Commission did make. In *Sneed* v. *Colson Corp.*, 254 Ark. 1048, 497 S.W. 2d 673, we said:

> "On appeal to the circuit court and to this court the only question for determination is whether or not there was any substantial evidence to sustain the Commission's finding and we, of course, in examining the evidence for such determination, must view it together with all reasonable inferences deducible therefrom, in the light most favorable to the Commission's finding the same as in a jury verdict. *Northwestern Nat'l Ins. Co.* v. *Weast*, 253 Ark. 710, 488 S.W. 2d 322; *Warwick Electronics* v. *Devazier*, 253 Ark. 1100, 490 S.W. 2d 792."

We agree with the circuit court's finding of facts contained in the record as above set out, but we disagree with the conclusion reached by the circuit court. The record in this case is made up from two separate hearings before the Referee. At the first hearing on December 17, 1971, Mrs. Hill testified that she went to work at Frolic Footwear in October, 1968, and had no physical defects or disability at that time. She testified that she sustained an injury to her back on the night of November 4, 1969, when a shoe rack almost tipped over on her. She said she went to the nurse immediately, reported her injury and then called Dr. Modelevsky who prescribed pain pills and requested her to come to the office the next morning if she felt no better. She said she did return to Dr. Modelevsky on November 5 and was given muscle relaxants and pain pills and was told she had pulled a ligament in her back. She said she was hospitalized at that time for pneumonia; was also treated for her back injury and was released to return to work on December 8, 1969. She said

she did return to work on December 9 and as she was going up an incline at the Frolic plant, she slipped and fell on the ramp, skinned both knees and again hurt her back but lost no work because of these injuries. She said she continued to work the remainder of 1969 "off and on" and then testified as follows:

"Q. Explain why you only worked off and on.

A. Well my back was hurting so bad, pushing and pulling those racks and some of them you couldn't hardly pull—you had to have two people to help— I would pull those racks and it would just tear me in two—I would have to take off a few nights and then maybe I would lay around and get to feeling better and I would return to work—Dr. Modelevsky would tell me I could go back to work and I would do it again for a while and the same thing would happen again."

Mrs. Hill testified that on February 3, 1970, she sustained a hernia and testified as follows:

"Q. When did you after that reinjure your back?

A. I reinjured my back January, 1971, and though I am sorry I am getting too far ahead of myself—I reinjured my back in August of '70—I lifted a box of shoes up over my head and my hernia came out again and my back was still just killing me and I re-entered the hospital at that time—I had hernia surgery—was also taken back to surgery for more treatment on my back."

Mrs. Hill testified that following her operation for hernia she returned to work about November 2, 1970, she then testified as follows:

"Q. Did you reinjure yourself again on December 22nd, 1970?

A. Yes, sir.

Q. Tell how you injured yourself at that time.

A. At that particular time I was pushing—pulling the rack just like I said and these racks were hard to push and pull and it yanked my back and I was reinjured in my back again."

Mrs. Hill testified that on January 5, 1971, she reentered the hospital and underwent surgery for a blocked intestine and also received treatment for her back. She said that after her January, 1971, hospitalization she has not returned to work. She said that Dr. Modelevsky referred her to Dr. Mahon in January, 1971, at which time she was having back pain and numbness in her leg and foot. She said that after conservative treatment failed to relieve her condition, Dr. Mahon referred her to Dr. Cunningham at St. Bernard's Hospital, who in turn referred her to a neurosurgeon in Memphis. She said the neurosurgeon referred her back to Dr. Mahon who performed a myelogram on July 12, 1971, and later performed surgery for a ruptured disc on July 22, 1971. She testified that she has been unable to work since she last worked for Frolic Footwear January 5, 1971.

At the second hearing on March 10, 1972, Mrs. Hill testified substantially as she did at the first hearing. She said she reported her back injuries to the first-aid nurse, Mrs. Collins, and to her supervisor.

Mrs. Joan Collins, the first-aid nurse at Frolic, testified from her records that on November 4, 1969, Mrs. Hill was sick and didn't come to work; that on November 5 she came to work and after 5 o'clock reported that she was sick. She said Mrs. Hill advised her that Dr. Modelevsky said she had pneumonia. She said she took Mrs. Hill's temperature and sent her home and at no time did Mrs. Hill ever report or complain to her of any injury involving her back.

Mr. Leonard Lee, foreman at the Frolic plant, testified that he does not recall Mrs. Hill ever reporting a back injury to him. He said, however, that he has about 60 women under his supervision and that if he listened to all of their complaints, he would do nothing else.

As already set out and as found by the circuit court, there is ample evidence that Mrs. Hill did receive a series

of injuries to her back in 1970 following the initial injury in November 1969. There is no question that Mrs. Hill was finally forced to cease work about January 5, 1971, because of the condition in her back, and there is no question that that disability resulted from the effects of a ruptured disc.

Turning now to the medical evidence in this case, Dr. A. C. Modelevsky, apparently the staff physician for the employer Frolic, rendered a report on August 8, 1971, stating that he first saw Mrs. Hill on November 5, 1969, at which time she gave a history of feeling something pop in her back when she was pulling a loaded shoe rack with a broken wheel. He said she was admitted to the hospital the following day where she remained for 13 days; that she was treated for viral pneumonia and back sprain. Dr. Modelevsky then reports as follows:

> "AP & lateral views of the lumbo sacral spine showed a satisfactory alignment of the vertebrae. The joint spaces were reported as intact and there was nothing seen to suggest an old or recent fracture, congenital defect or significant arthritic changes. She was seen again at the office on 11/24/69, still complaining of low back pain, numbness and stated that 'toes feel like they were frozen.' She was seen again at my office on 12/1/69, feeling much better and returned to work on 12/8/69. * * *

> On 2/3/70, while at work felt a sharp pain in rt. groin and had a recurrence of a previous rt. inguinal hernia—this was reduced in the Emergency Room at the hospital and after resting a couple of days, was able to return to her work. On 8/28/70, she again hurt her side and was admitted to the hospital on 8/30/70 for repair of the rt. inguinal hernia—this was done on 8/31/70. She stayed in the hospital until 9/5/70. She was seen in my office on the following days 9/14/70, 9/21/70, 9/28/70, 10/5/70 account of her back ache —she was treated with rest, and various muscle relaxants. She returned to work on 11/2/70."

Dr. Modelevsky then reported unrelated intestinal surgery and liver complications suffered by Mrs. Hill, all of which

he described as a rather "stormy course." He said, however, that she recovered and was able to be discharged on 2/10/71. He then stated:

"Since that time, she has not been able to do any of her work on account of her back pain—she was seen in consultation by Dr. Larry Mahon and Dr. Craig Grant, a neurosurgeon. She recently had disc surgery —I had not seen her since her last admission to the hospital."

Under date of July 22, 1971, Dr. Larry E. Mahon, an orthopedic surgeon, reported that he first saw Mrs. Hill on April 13, 1971. Dr. Mahon reported a history of occupational back injury occurring in August, 1970. It would appear from the history, as related by Dr. Mahon, that Mrs. Hill confused the 1969 accident when the shoe rack tipped over as testified by her, with the accident in which she sustained her hernia in 1970. In any event, Dr. Mahon reported that Mrs. Hill's primary complaint was of low back pain and pain in the right leg with paresthesia and weakness in the right leg. He then reported as follows:

"PHYSICAL EXAMINATION found her to be a well developed, small white female; alert, cooperative, in no acute distress. Gait pattern was within normal limits. Examination of her back found there to be tenderness about the lumbosacral area with 50% limitation of motion in all planes. There was noted to be a positive straight leg raising test bilaterally, more marked on the right side. Neurological examination found there to be a sensory deficit corresponding to the L-4, 5 nerve root dermatone on the right side. There was also depression of the right ankle jerk.

I subsequently admitted her to the hospital on 4/28/71, did a *myelogram which was equivocal.* She was treated conservatively and discharged improved on 5/6/71. I saw her again on 6/21/71, stating that she was again having severe pain in her back and pain in the leg. Her examination was slightly improved. I recommended more aggressive exercise for her back and recommended she remain off from work. I saw her again on 7/12/71, still complaining of

numbness in the right leg, pain in the lowback. Her examination was significant in that she had numbness, still, in the right leg in the L-4, 5 dermatone pattern, however, she also had some aspect of bizarre numbness as well. The straight leg raising was still positive on the right side.

I readmitted her to the hospital and *did a repeat lumbar myelogram on 7/21/71, which this time showed a definite defect at L-4, 5 on the right side.* I plan on doing a laminectomy on her in the morning and will send you an additional report when she is discharged from the hospital." (Our emphasis).

Liberty Mutual earnestly contends that this case is on all fours with the case of *St. Paul Ins. Co.* v. *Liberty Mutual Ins. Co.,* 250 Ark. 209, 464 S.W. 2d 566, but that case is clearly distinguishable on the evidence of subsequent injury. In the *St. Paul* case the claimant-employee was injured when he fell from a tractor in November, 1968. Within two weeks following the November injury, the claimant's right leg and foot started going to sleep and the condition got progressively worse until surgery was required on April 6, 1969. Liberty Mutual was the insurance carrier until January 1, 1969, when St. Paul became the insurance carrier. Compensation was awarded equally against both carriers by the Commission and we reversed because there was no substantial evidence to support the Commission's finding that St. Paul was liable.

The only evidence in that case of any injury at all except the November, 1968, injury was elicited from the claimant in a discovery deposition when he was asked if he had received any other injury, and to which he replied:

" 'Well, at one time I noticed my back hurt me more. I was moving some—you know, my legs and things was bothering me more. I was moving some steel and of course, I was doing some lifting and I noticed it. * * * It was my leg more or less, my back didn't hurt so much it just—I don't know how to explain it, just my legs.' "

The record in the *St. Paul* case then reflects the following:

" 'Q. Did you have any specific instance when you were lifting something that you felt—

A. Like I say, when I was lifting that steel that time why I noticed it was hurting me more. I was stiff, you know for awhile.

Q. Did you feel any popping in your back or anything like that?

A. No sir, I didn't, no.' "

The claimant in *St. Paul* then testified that following the accident in November, 1968, his right foot and leg started going to sleep and it just got progressively worse until finally he had to go to the doctor. He testified that his condition was gradually getting worse up until he moved some steel and it seemed like it hurt worse after he moved some steel. He said he did not know whether moving the steel or just time made his condition worse. He said he knew that he just got worse. He said that from the date of his accident and the onset of his symptoms his condition just got worse as every day went on.

Disability is the primary compensable element in a compensation case and the compensability is not questioned in the case at bar. We agree with the circuit court that according to the record in this case, Mrs. Hill suffered several (if not severe) back injuries which aggravated her condition following her initial injury on November 5, 1969. Mrs. Hill continued to work "off and on" until January 5, 1971, when she was forced to quit work because of her back.

Following her initial injury in 1969 x-rays were negative and Mrs. Hill was treated for "back sprain" by Dr. Modelevsky. Following her subsequent injuries in 1970 and 1971 myelogram findings on 4/28/71 were equivical and on July 21, 1971, a subsequent myelogram examination revealed a *definite defect*. We are of the opinion there was substantial evidence from which the Commission could have found that Mrs. Hill's rup-

tured disc and related disability actually occurred as a result of one or all of the back injuries sustained by her subsequent to 1969.

The judgment of the circuit court is reversed and this cause is remanded with directions to affirm the award of the Commission.

Reversed and remanded.